COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS


| | | |
|---|---|---|
| ERIC MATSUMURA DUVALL, | § | No. 08-19-00313-CR |
| Appellant, | § | Appeal from the |
| v. | § | Criminal District Court Number One |
| THE STATE OF TEXAS, | § | of El Paso County, Texas |
| Appellee. | § | (TC# 20160D01661) |

## **O P I N I O N**

A jury convicted Appellant Eric Matsumura Duvall of capital murder for the death of Michael Tapia, and the trial court sentenced him to life without parole. In two issues, Duvall challenges the legal sufficiency of the evidence and the trial court's admission of certain testimony. Finding no error, we affirm.

## I. BACKGROUND

On the evening of January 31, 2016, Sergeant Juan Ibarra of the El Paso Sheriff's Office (EPSO) responded to a report of a body found in a desertous area in El Paso County. Upon arrival, Sergeant Ibarra discovered a body lying on the ground, face down, with no signs of life. Ibarra noted the body had an apparent head trauma and blood was visible on the ground nearby. Two

bullet shell casings were found in the vicinity. Sergeant Ibarra formed an initial impression that the body had been there for some time due to the coloring of some of the exposed skin.

The case was transferred to the major crimes section of the EPSO and assigned to Sergeant Jerome Washington for investigation.[1] By the following day, the body had been identified as Michael Tapia. Investigative efforts led to two suspects, Duvall and Tyler Hall. In obtaining arrest warrants for both suspects, Sergeant Washington learned that both were enlisted in the U.S. Army and stationed at Fort Bliss. After informing the Army's Criminal Investigations Division, military police arrested Duvall and Hall at Fort Bliss. Duvall and Hall were subsequently interviewed and arrested by the EPSO in connection with Tapia's death.

Duvall was charged by indictment with the capital murder of Tapia and trial was held December 6-12, 2019. The State alleged Duvall committed capital murder while in the course of committing or attempting to commit kidnapping. At trial, the State called five witnesses who testified about events leading up to and occurring on January 16, 2016, and ultimately, the conduct that led to Tapia's capital murder. Additionally, the State called other witnesses including Tapia's cousin, various officers from EPSO who were involved in the investigation, two crime scene investigators, two Customs and Border Protection agents, an officer with the Army's Criminal Investigations Division, the medical examiner who conducted Tapia's autopsy, a forensic scientist, and Katye Elston, who was dating Duvall prior to his arrest on the capital murder charge.

In its case-in-chief, the defense called two witnesses, Antonio Arias, a retired detective who was present at Tapia's autopsy, and Dr. Rascon, the medical examiner who conducted the

---

[1] At the time, Washington was a detective in the EPSO's major crimes section.

2

autopsy.[2] The State and Duvall also presented a number of exhibits to the jury. The evidence presented to the jury is detailed below.

## A. Trial Testimony on the Events of January 16, 2016

The State's five witnesses who ultimately testified about the events leading up to and including January 16, 2016, included Kristan Arzate, Morgan Dailey, Troy Taylor, Cyruss Cedillos, and Ariel Ochoa. All five were friends and associates of Duvall, and their collective testimony was generally consistent: At some point in 2015, Duvall moved into a house on Sunset Rose Drive with his friend, Noah Lindquist, and Lindquist's cousin, Kristan Arzate. Arzate soon learned that Duvall sold Ecstasy pills. Arzate began consuming Ecstasy and attending raves with Duvall on a regular basis. Duvall eventually moved out of the Sunset Rose house and into a mobile home, where Arzate occasionally visited, along with other members of their friend group, including Michael Tapia (the victim in this case), Hall (the other individual arrested along with Duvall), Arlene Pina, and the other four associate-witnesses, Troy Taylor, Cyruss Cedillos, Morgan Dailey, and Ariel Ochoa. Tapia, Hall, Pina, Taylor, Cedillos, Dailey, and Ochoa all helped Duvall sell Ecstasy pills. Dailey was also a member of Duvall's and Hall's Army unit.

In October of 2015, Tapia set up a narcotics deal for Duvall where two men were supposed to pay an unusually high price for some Ecstasy pills. Duvall, Tapia, and Taylor met the buyers together. Duvall and Tapia got into the buyers' vehicle, and after a few minutes, Tapia quickly exited the vehicle before it drove off with Duvall being held at gunpoint. Moments later, Duvall fell out of the buyers' moving vehicle and got back into the vehicle with Taylor and Tapia. As a

---

[2] Dr. Rascon had previously testified as one of the State's witnesses.

result of this incident, the group became suspicious of Tapia.[3]

On January 16, 2016, Arzate, Hall, Dailey, Ochoa, Tapia, and a neighbor named Edgar were all present at the Sunset Rose house. Meanwhile, Duvall and Taylor were driving back from attending a rave in Albuquerque, New Mexico. At some point that day, Hall discovered a bag containing narcotics had been stolen from his vehicle. Hall, angry, questioned the others about what may have happened to his narcotics. It was generally presumed amongst the group that the neighbor, Edgar, had stolen the narcotics, and that Tapia was also possibly involved. The suspicion of Tapia increased when he left the house with Edgar. Hall called Duvall, and after they spoke, Hall, Ochoa, and Pina went to Duvall's mobile home to retrieve some clothes and a rifle. At some point during this time, Duvall and Taylor arrived at the Sunset Rose house.

Ultimately, Tapia was coaxed out of the neighbor's house and brought back to the Sunset Rose house, where Duvall and Pina angrily blamed him for the loss of the narcotics. Tapia, crying and upset, borrowed Arzate's cell phone to make calls to ask for money. At least one of those phone calls was made to his cousin, Sasha Ortez. Tapia told his cousin he needed money because "his friends got him in trouble." When Tapia returned from making his calls, Hall, carrying a handgun, grabbed Tapia by the arm and led him out of the house. Duvall grabbed a black and green AR-15 rifle—presumably the one Hall had retrieved from Duvall's trailer—and stated he was going to kill Tapia. Duvall, Hall, Dailey, and Tapia got into Duvall's truck and drove away.

Duvall eventually pulled off into a desertous area, where he, Hall, and Tapia exited the

---

[3] Outside the presence of the jury, the trial court also heard testimony about the aftermath of this botched narcotics deal, where Duvall allegedly lured the buyers to a location and delivered beatings with a crowbar. The testimony regarding the unsuccessful deal was allowed admission for the purpose of establishing Duvall's motive and intent to kill Tapia, but the violent aftermath flowing from that transaction was not admitted and not heard by the jury.

vehicle. Duvall grabbed the rifle from the bed of the truck and handed it to Hall, and the trio walked into the desert, leaving Dailey behind at the truck. After a few minutes, Duvall and Hall returned without Tapia. Hall put the rifle back in the bed of the truck and they drove away. Although Dailey told investigators he heard a gunshot, at trial, he testified he did not hear a gunshot or see a muzzle flash. Dailey testified the noise level was loud inside the truck due to music and the truck's diesel engine.

Duvall, Hall, and Dailey returned to the house about an hour after they had left. Duvall and Hall were smiling, but Dailey was quiet and "looked like he [had] just [seen] a ghost." Hall stated openly that he had "double tapped"[4] Tapia. Before Duvall, Hall, and Dailey left for a party, Duvall told everyone in the house to keep their mouths shut and threatened to shoot people if they said anything about the incident.

## B. Duvall and Hall Arrested by U.S. Customs and Border Protection (CBP)

On January 24, 2016, CBP arrested Duvall and Hall as they crossed the border from Mexico, attempting to smuggle Ecstasy pills and a Glock 10mm handgun into the United States. During the arrest, CBP seized Duvall's cell phone. The Army's Criminal Investigations Division (CID) took custody of Duvall and placed him in confinement at Fort Bliss beginning on January 25, 2016. The Army's CID conducted a forensic data analysis of Duvall's cell phone, which yielded: (1) a photograph of an AR-15 rifle and (2) a series of January 16, 2016, text messages between Duvall and Pina. Generally, the text message conversation between Duvall and Pina is consistent with testimony given about the day Tapia was killed. Included in the text message thread

---

[4] Arzate testified that he interpreted Hall's statement that he "double tapped" Tapia to mean Hall had shot Tapia twice.

is Pina informing Duvall that they "are gonna kill Michael[,]" that they "are going to beat him to death and shoot him[,]" and again that they "are killing them[.]"

Katye Elston was dating Duvall at the time and was present at the border crossing when Duvall and Hall were arrested. Sometime between January 20 and January 24, 2016, Duvall told Elston that he had been robbed and that he and Hall "took care of it" by "knock[ing the person] off."

## C.  Autopsy of Tapia's Body

Dr. Mario Rascon, the Chief Medical Examiner for the El Paso County Office of the Medical Examiner, conducted an autopsy of Tapia's body. Dr. Rascon concluded that Tapia died from a gunshot wound to the neck and opined that Tapia's manner of death was homicide. Dr. Rascon declined to make a determination regarding Tapia's day and time of death, testifying that too many variables contribute to the rate of decomposition of bodies. Dr. Rascon further stated he never includes time-of-death estimates in his autopsy reports because, in his opinion, no time-of-death formula is reliable.

Duvall called Detective Antonio Arias, who was present during Tapia's autopsy, to the stand. Detective Arias testified that Dr. Rascon told him that Tapia's body "might have been [in the desert] about two days." When he was recalled by Duvall, Dr. Rascon testified that while he did not remember telling Detective Arias that Tapia's body could not have been at the scene more than two days, he did remember remarking that the body did not appear from the photographs to have been present at the scene for a prolonged period of time. Dr. Rascon testified that his opinion changed after the autopsy and a more thorough examination of the facts surrounding the case, and that his conclusion was that the decomposition of Tapia's body was consistent with a January 16

6

date of death.

**D. Other Evidence Recovered in the Investigation**

During his investigation, Sergeant Washington obtained a search warrant for a storage unit he believed belonged to Duvall, as well as a warrant for Hall's Mitsubishi Eclipse. A search of the storage unit yielded the following evidence: (1) narcotics paraphernalia; (2) counterfeit money; (3) small baggies that often contain narcotics; (4) an Army uniform with the name "Duvall" on it; (5) a postal package with the name "Eric Duvall" on it; and (6) loaded magazines and loose ammunition. The magazines were for an AR-15 rifle, and some of the loose ammunition was of the caliber used in an AR-15 rifle. Additionally, the loose AR-15 ammunition found in Duvall's storage unit appears to have the same headstamp as the two casings found near Tapia's body, including the initials "LC". The Texas Department of Public Safety Firearms/Toolmarks Laboratory Report identified the manufacturer of the two casings found near Tapia's body as "Lake City." A search of Hall's car yielded a small plastic baggie containing unknown pills and a black and green AR-15 rifle. Subsequent testing established that the rifle recovered from Hall's car was the same one that fired the two cartridge cases recovered near Tapia's body.

Following the presentation of evidence, the trial court issued jury instructions allowing for a capital murder conviction under any of three theories of liability: that Duvall committed capital murder (1) directly, (2) as a party along with Hall, or (3) as a conspirator along with Hall. The jury returned a guilty verdict on the charge of capital murder. After Duvall elected for the trial court to impose punishment, he was sentenced to life in prison.

This appeal followed.

## II. ISSUES PRESENTED

In Duvall's first issue, he challenges the legal sufficiency of the evidence to support his conviction for capital murder. In his second issue, Duvall argues the trial court erred in admitting certain testimony by witness Troy Taylor, based on the accomplice-witness rule and Texas Rule of Evidence 403.

We address Duvall's issues in that order.

## III. DISCUSSION

### A. Issue One – Sufficiency of the Evidence

In his first issue, Duvall challenges the legal sufficiency of his conviction for capital murder. Specifically, Duvall contends he was in military confinement at Fort Bliss during the period of time that Tapia was killed, according to Dr. Rascon's pre-autopsy estimate as to Tapia's time of death.

#### 1. Standard of Review

Under a sufficiency of the evidence review, we view all evidence in the light most favorable to the verdict in order to determine whether any rational fact finder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Brooks v. State*, 323 S.W.3d 893, 894-95 (Tex. Crim. App. 2010). In considering the evidence, we keep in mind that the trier of fact is the sole judge of the weight and credibility of the evidence and we must presume that the fact finder resolved any conflicting inferences in favor of the verdict and defer to that resolution. *See* TEX. CODE CRIM. PROC. ANN. art. 38.04; *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014).

We must presume that the jury resolved any conflicting inferences from the evidence in

favor of the verdict. *Azzam v. State*, No. 08-17-00137-CR, 2019 WL 457608, at \*2 (Tex. App.—El Paso Feb. 6, 2019, no pet.) (not designated for publication). We are not permitted to reevaluate the weight and credibility of the evidence or substitute our judgment for that of the fact finder. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). Additionally, a lack of direct evidence is not dispositive on the issue of the defendant's guilt; circumstantial evidence on its own can establish guilt. *See Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004).

### 2. Applicable Law

In a criminal case, the State has the burden to prove each and every element of an offense beyond a reasonable doubt, and the defendant in a criminal case is presumed to be innocent until such proof is shown. TEX. CODE CRIM. PROC. ANN. art. 38.03; TEX. PENAL CODE ANN. § 2.01. Relevant to the facts of this case, a person commits capital murder if he intentionally or knowingly causes the death of another person while he is in the course of committing or attempting to commit kidnapping. TEX. PENAL CODE ANN. §§ 19.02(b)(1), 19.03(a)(2). In Texas, kidnapping is intentionally or knowingly abducting another person. TEX. PENAL CODE ANN. § 20.03. A person acts intentionally when it is his conscious objective or desire to cause the result of his action. TEX. PENAL CODE ANN. § 6.03(a). A person acts knowingly when he is aware that his conduct is reasonably certain to cause the result. TEX. PENAL CODE ANN. § 6.03(b).

"A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." TEX. PENAL CODE ANN. § 7.01(a). A person is criminally responsible for the conduct of another if, "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense . . . ." TEX. PENAL CODE

9

ANN. § 7.02(a)(2). In such a case, "[e]ach party to an offense may be charged with commission of the offense." TEX. PENAL CODE ANN. § 7.01(b). In determining whether the defendant acted as a party, a reviewing court should consider the events occurring before, during, and after the offense, and the reviewing court may rely on actions of the defendant that show an understanding and common design to commit the offense. *See King v. State*, 29 S.W.3d 556, 564 (Tex. Crim. App. 2000).

A defendant may also be liable as a conspirator if, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit that offense, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of carrying out the conspiracy. *See* TEX. PENAL CODE ANN. § 7.02(b).

### 3. Analysis

"[S]ufficiency of the evidence should be measured by the elements of the offense as defined by the hypothetically correct jury charge for the case." *See Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). When the jury charge authorizes a conviction on any one of multiple theories, as was the case here, a guilty verdict will be upheld if the evidence is sufficient on any theory authorized in the charge. *Anderson v. State*, 416 S.W.3d 884, 889 (Tex. Crim. App. 2013) (citing *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004)). An essential element of any offense is the defendant's identity. *See Russell v. State*, 113 S.W.3d 530, 541 (Tex. App.—Fort Worth 2003, pet. ref'd) ("Identity is an 'elemental fact' in every criminal case[.]"). A defendant may place his identity in issue by raising an alibi defense. *See Dickey v. State*, 646 S.W.2d 232, 233 (Tex. Crim. App. 1983) (en banc).

10

Aside from Duvall's identity, the statutory elements of capital murder, as charged in the indictment and applied to the facts of this case, are whether Duvall (1) intentionally or knowingly (2) caused (3) the death of Tapia (4) while in the course of committing or attempting to commit kidnapping, which is defined as abducting another person. Although Duvall does not use the word "identity" or "alibi" in his brief filed in this appeal, we construe his legal sufficiency challenge based on Dr. Rascon's alleged pre-autopsy statement, coupled with Duvall's period of confinement, as an alibi defense and a challenge to the element of Duvall's identity as the perpetrator of Tapia's capital murder. Here, we need only address the sufficiency of the evidence as it pertains to the identity element of Duvall's conviction because he does not challenge any other element. *See Murray v. State*, 457 S.W.3d 446, 448 n.1 (Tex. Crim. App. 2015) ("We solely address the sufficiency of the evidence as it pertains to the element of 'operating' in the DWI statute because Appellant challenged only that element . . . .").

Viewed in the light most favorable to the verdict, we determine the record contains legally sufficient evidence to establish Duvall committed capital murder of Tapia or that he was at least a party to the offense. The State called five witnesses who were present at the Sunset Rose house on January 16, 2016, and who testified consistently about the events that took place that day, namely that: (1) some pills were stolen from Hall's car; (2) the group suspected Edgar and possibly Tapia to have stolen the pills; (3) Tapia and Edgar left the Sunset Rose house together; (4) Hall was angry and called Duvall to relay the information about the stolen pills; (5) Tapia ended up back at the Sunset Rose house, where he made at least one phone call to try to get money to pay Hall back for the pills; (6) when Duvall returned to the Sunset Rose house, Hall, armed with a pistol, grabbed Tapia's arm and led him to Duvall's truck; (7) Duvall left the Sunset Rose house with a black and

11

green AR-15 rifle; (8) Duvall, Hall, Dailey, and Tapia then drove away in Duvall's truck; (9) Duvall, Dailey, and Hall returned later without Tapia; (10) Hall bragged that he had "double tapped" Tapia; and (11) Duvall threatened everyone else at the house and warned them not to discuss the aforementioned events with anyone.

Part of that testimony was corroborated by Sasha Ortez' testimony that Tapia called her on January 16 asking for money because his friends had gotten him into trouble. Other parts are corroborated by the January 16 text messages between Duvall and Pina found on Duvall's phone, where Pina is updating Duvall on the situation the witnesses describe and the pair discuss killing Tapia as a result. We also consider Dailey's testimony about what happened after he, Duvall, Hall, and Tapia left the Sunset Rose house together, namely that: (1) they drove to a desertous area in El Paso County; (2) Dailey remained in the truck while Duvall and Hall—armed with a pistol and an AR-15—walked Tapia out into the desert at gunpoint; (3) Duvall and Hall returned several minutes later without Tapia.

We do note that Duvall's identity as the direct perpetrator of—or a party to—Tapia's capital murder is strongly tied to whether the offense occurred on January 16, 2016. Duvall argues that because Dr. Rascon allegedly stated that Tapia's body did not appear to have been in the desert for more than a couple of days, Duvall could not have committed Tapia's capital murder because he was in confinement at Fort Bliss for the six days preceding the discovery of Tapia's body. Duvall called former Detective Antonio Arias to the stand to testify about a conversation he had with Dr. Rascon during Tapia's autopsy. Detective Arias testified that at the time of the autopsy, Dr. Rascon estimated that Tapia's body might have been in the desert for about two days. Duvall then recalled Dr. Rascon to the stand, and essentially asked him to respond to what Detective Arias

12

said. Dr. Rascon disagreed that he made the statement as Detective Arias recalled it, but instead testified that "when the case was presented to me and I saw the first photo from the scene, I remember thinking out loud, well, this doesn't look like someone that has been out there for a prolonged period of time." Dr. Rascon further testified that there are too many factors that affect body decomposition, including air temperatures and humidity, and that any estimate encompasses such a broad range of time that it is often more accurate to use other facts known from an investigation to determine an accurate date of death. Dr. Rascon testified that, because of the many variables affecting body decomposition, he does not include date or time of death estimates in his autopsy reports. Ultimately, Dr. Rascon testified that a date of death for Tapia of January 16, 2016, was consistent with his autopsy findings.

Here, the record includes conflicting testimony about whether Dr. Rascon had given his opinion to Detective Arias that Tapia's body had only been in the desert two days prior to its discovery on January 31. Detective Arias claims that Dr. Rascon made such a statement, while Dr. Rascon denies that his statement was that specific. It was the jury's responsibility to settle that conflict in testimony, and they were free to believe Dr. Rascon over Detective Arias. If the jury believed Dr. Rascon's recollection of his statement, it would have been reasonable for them to determine that two weeks was not "a prolonged period of time." Even if the members of the jury believed Detective Arias, they could have also believed Dr. Rascon when he testified that whatever he said in Detective Arias' presence was a preliminary and unreliable estimate without more facts, which would also explain why Dr. Rascon made no such finding in his autopsy report. Finally, the members of the jury were free to believe—no matter what Dr. Rascon may have stated before or during Tapia's autopsy—Dr. Rascon's ultimate testimony, which was that nothing in the autopsy

13

precluded a date of death of January 16, 2016.

As a result, we determine there was legally sufficient evidence of Duvall's identity as the direct perpetrator of, or at least as a party to, the capital murder of Tapia, on January 16, 2016. Duvall's first issue is overruled.

## B. Issue Two – Admissibility of Certain Testimony

In his second issue, Appellant challenges the trial court's admission of Troy Taylor's testimony about the botched narcotics deal that was set up by Tapia and ended with Duvall being thrown from a moving vehicle. Duvall argues that the admission of this testimony violates the accomplice-witness rule and, also, that it should have been excluded under Texas Rule of Evidence 403.

### 1. Standard of Review

We review a trial court's ruling on the admissibility of evidence for abuse of discretion. *Montgomery v. State*, 810 S.W.2d 372, 390-93 (Tex. Crim. App. 1991) (op. on reh'g). We will uphold the trial court's decision to admit or exclude evidence if it falls within the zone of reasonable disagreement, and we afford "great discretion" to a trial court in its decision to admit evidence and give corresponding deference to its evidentiary decisions. *Id.* at 378.

### 2. Applicable Law

Under the accomplice-witness rule, "[a] conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed . . . ." TEX. CODE CRIM. PROC. ANN. art. 38.14. However, article 38.14 is a rule for sufficiency review, not an evidentiary rule. *Qualls v. State*, 547 S.W.3d 663, 675 (Tex. App.—Fort Worth 2018, pet. ref'd) (citing *Kennedy v. State*, 193 S.W.3d 645, 662 (Tex. App.—Fort

14

Worth 2006, pet. ref'd) (op. on reh'g)). Stated differently, article 38.14 "does not govern the admissibility of evidence; rather, it governs determinations of sufficiency of the evidence when an accomplice testifies." *Id.*

A defendant's remedy for a potential violation of the accomplice-witness rule is to request a jury charge that informs the jury that it may not convict based solely on the testimony of an accomplice. *See Valdez v. State*, No. AP-77,042, 2018 WL 3046403, at *17 (Tex. Crim. App. 2018) (not designated for publication). A defendant's further remedy would be to object if a trial court did not include such an instruction or—in the case where an instruction was included but the jury convicted the defendant based solely on accomplice testimony anyway—to appeal the conviction based on a lack of sufficient evidence. *Id*. But that is not the posture in which the accomplice-witness rule is brought to our attention in this appeal. Instead, Duvall argues that the rule should have barred the trial court from admitting what Duvall claims is uncorroborated accomplice-witness testimony.

We agree with our sister court that article 38.14 does not govern the admissibility of evidence. *See Qualls*, 547 S.W.3d at 675 (citing *Kennedy*, 193 S.W.3d at 662). Therefore, to the extent that Duvall asks us to find that the trial court abused its discretion in admitting Taylor's testimony as a result of article 38.14, we decline to do so. However, Duvall did object in the trial court to the admission of this evidence based on Rule 403, and he raises that issue on appeal as well.[5] Therefore, we construe Duvall's second issue on appeal as a Rule 403 challenge, which, as stated above, we review for an abuse of discretion.

---

[5] As a final note on the accomplice-witness rule discussion, Duvall has not pointed to any location in the record— nor can we find one—where he made any objection based on or related to the accomplice-witness rule.

15

Relevant evidence may be excluded by the trial court if its probative value is substantially outweighed by the danger of unfair prejudice. TEX. R. EVID. 403. In determining whether a trial court's admission or exclusion of evidence violated Rule 403, we balance the follow factors:

> (1) the inherent probative value of the evidence and (2) the State's need for that evidence against (3) any tendency of the evidence to suggest a decision on an improper basis, (4) any tendency to confuse or distract the jury from the main issues, (5) any tendency to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or be needlessly cumulative.

*Knight v. State*, 457 S.W.3d 192, 204 (Tex. App.—El Paso 2015, pet. ref'd) (citing *Gigliobianco v. State*, 210 S.W.3d 637, 641-42 (Tex. Crim. App. 2006)). Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial. *Gallo v. State*, 239 S.W.3d 757, 762 (Tex. Crim. App. 2007).

### 3. Analysis

Under the first factor from *Knight* and *Gigliobianco*, the State argues that the evidence is probative of Duvall's intent and motive to commit the capital murder of Tapia. The State argues that the evidence tends to establish that, prior to January 16, 2016, Duvall was already distrustful toward Tapia as a result of the earlier botched narcotics deal. The State further argues—under the second 403 factor—that it needed the evidence to lend credence to its theory that Duvall committed the offense because he believed Tapia to be distrustful. We agree with the State's arguments regarding these two factors. Although, as Duvall points out, Taylor testified that Duvall did not necessarily blame Tapia for the earlier botched deal, he also testified that the group was upset with Tapia for setting up the deal. We determine that the evidence of the earlier botched deal shows why the group immediately suspected Tapia of being involved in the theft of the pills from Hall's

16

truck on January 16. Without the evidence, it would be reasonable for a juror to wonder why the group jumped to that conclusion so quickly, and why Duvall and Hall decided to punish Tapia so severely. In short, we agree with the State that this evidence was significantly probative of Duvall's motive and intent and that it provided a necessary link between the missing pills on January 16, the group's assumption that Tapia was behind the theft, and the drastic response taken by Duvall.

Moving to the third factor—any tendency of the evidence to suggest a decision on an improper basis—Duvall argues that the only way the evidence could be taken is as "a sensational story" meant to paint Duvall as a dangerous and violent drug dealer. We disagree. First, as we have already stated, this evidence tends to show a possible motive for Duvall's culpability in committing the charged offense either directly or as a party. Second, we cannot say that Taylor's testimony regarding the earlier, botched narcotics deal was particularly inflammatory; there was already significant evidence that Duvall had at least five people working for him selling drugs. Third, the trial court only narrowly permitted testimony about the botched deal portion of the transaction while excluding testimony about the aftermath which described that Duvall had lured the offending buyers to a location and attacked them with a crowbar.

We also cannot say—under the fourth factor—that this evidence had any tendency to confuse or distract the jury from the main issues of the case. In fact, we determine it helped answer what would have otherwise been a burning question, that is, why Duvall immediately suspected Tapia's involvement with the missing pills on January 16, and why he so quickly decided it necessary to commit capital murder of Tapia.

Duvall makes no argument advancing his position under the fifth factor, whether the evidence had any tendency to be given undue weight by a jury that was not equipped to evaluate

the probative force of the evidence. We determine that this evidence did not have any such tendency.

Finally, under the sixth and final factor, Taylor's testimony regarding this incident—in front of the jury and under the State's questioning—spanned just three pages of the reporter's record, out of over 700 pages recorded in four volumes. We determine that the testimony did not consume an inordinate amount of time. Even from the trial court's perspective at the time the decision to admit the testimony was made, it was obvious that the testimony would not consume an inordinate amount of time because the court heard the testimony first outside the presence of the jury—and disallowed a portion of that testimony.

Given the deferential standard of review regarding the admission of evidence, the presumption in favor of admitting relevant evidence, and the weighing and balancing of the six factors from *Knight* and *Gigliobianco*, we cannot say the trial court's decision to admit Taylor's testimony regarding the botched narcotics deal fell outside the zone of reasonable disagreement, and therefore, constituted an abuse of discretion. *See Montgomery*, 810 S.W.2d at 392.

Duvall's second issue on appeal is overruled.

## IV. CONCLUSION

We affirm the trial court's judgment.

GINA M. PALAFOX, Justice

September 29, 2021

Before Rodriguez, C.J., Palafox, and Alley, JJ.

(Do Not Publish)

18